## Case No. 12,504.

### SCHWARTZ v. INSURANCE CO. OF NORTH AMERICA.

[3 Wash. C. C. 117.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1811.

MARINE INSURANCE — WARRANTY OF NEUTRALITY —NEUTRALITY LAWS—ACTS IN VIOLATION.

1. The meaning of the warranty of neutrality is, that the property insured is neutral in fact, and shall be so in appearance and conduct; that the property shall belong to neutrals; that it shall be so documented as to prove its neutrality; and that no act of the insured or his agents shall be done, which can legally compromise its neutrality.

2. The laws of nations do not prohibit the carrying of enemies' goods in neutral vessels; so far from so doing, upon the condemnation of the goods, the vessel is entitled to freight.

3. But, if a neutral endeavours by false appearances, to cover the property of a belligerant from the lawful seizure of his enemy, such conduct identifies the neutral with the belligerant whom he thus endeavours to protect; and the increase of risk, by being carried in for adjudication, is produced not by a legal act, but by a fraud on the neutrality of his own government, and upon the rights of the belligerant.

4. The warranty of neutrality is broken, by unneutral conduct in the insured.

5. It is enough to produce a forfeiture of the indemnity of the insurance, if the risk is varied or increased, by conduct inconsistent with the duties of neutrality.

Policy on the ship Margaret, at and from Batavia to Baltimore, dated January 19th, 1807; valued at 25,000 dollars, of which 20,000 dollars were underwritten—warranted American property, proof to be made at Baltimore only. The order for insurance mentioned, that the outward cargo of this vessel had consisted of goods contraband of war. The facts, as appeared by the evidence, were, that this ship sailed with a cargo of contraband, in 1804, commanded by William M'Fadon, the part owner, and stopped at the Cape of Good Hope, where she sold part of her cargo; thence she proceeded to the Isle of France, where she sold the balance, on credit, to the government. In November, she sailed for Batavia, with 12,000 dollars in specie, the greatest part of which was the proceeds of this outward cargo. There not being at Batavia produce sufficient to load her, M'Fadon chartered her to a Mr. Arnold, a Dutch merchant of that place, on a voyage to Tranquebar, and there left her under the command of one Deshon, the mate, and in

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington. Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr., Esq.]

case of any accident to him, Herd was to command her; he, M'Fadon, returning to the United States in another vessel. By the illness or death of Deshon, the command devolved on Herd, who made the voyage to Tranquebar, and back to Batavia, as well as a second voyage to the same place, and on account of the same person. In consequence of the ship requiring twice to be repaired, Herd was compelled to expend considerable sums on that account; and not having funds sufficient for this purpose, and to procure her load, he entered into a written agreement with Arnold, (who wished to come to the United States with his family and property,) to the following effect: The ship was to be loaded with coffee, sugar, &c., the produce of the island, on account of Arnold and the plaintiffs [F. & A. Schwartz, survivors of William M'Fadon], to be consigned to the plaintiffs, who were to sell the same without charging commissions, and the proceeds to be paid one-half to Arnold. Arnold to pay a stipulated sum for the freight of his part of the cargo, and the transportation of himself and family; and also, to advance to Herd, what money he might want to pay for his half of the cargo. In order to neutralize the property, Herd was, in addition to the real bills to be drawn on his owners for their part of the cargo, to draw bills to the amount of 30,000 dollars on his owners, in favour of Arnold, which, however, they were not expected to pay. For the security of Arnold, Herd, by the same contract, agreed to hypothecate the vessel, cargo, and policies of insurance. The bill of lading, invoice, and other papers, stated the cargo to belong to the plaintiffs, citizens of the United States. In March, 1807, she sailed from Batavia—Arnold died on the voyage. She was afterwards brought to by a British cruiser, the captain of which, after inspecting such of her papers as were shown by Captain Herd, was induced, in consequence of suspicions excited by some of the sailors of the Margaret, to examine the trunks belonging to Arnold. Here they found the above agreement, as well as property of great value, in precious stones. The vessel and cargo were taken into Barbadoes, and condemned as enemy's property; the captain claimed the ship and half the cargo for the plaintiffs. On notice of the capture, the plaintiffs offered to abandon, which was refused. The order for insurance, stating the nature of the outward cargo, was communicated to the defendants. The objections made to the plaintiffs' recovery were —1. That the plaintiffs have not proved themselves to be citizens of the United States, as the certificate of naturalization of the plaintiff, Augustus Schwartz, mentions Augustus Jacob. The evidence, however, very clearly proved, that they were, in fact, the same person, the additional name of Jacob being dropped in the firm of the house. 2. A deficiency in the proof, that the vessel was the property of the plaintiffs. All her papers

being lodged in the admiralty, at Barbadoes, and the defendants not consenting to read the record, the evidence to prove property, consisted principally of acts of ownership exercised by the plaintiffs, and the letters of Herd to them as owners. To prove such evidence as this sufficient, the plaintiffs read 5 Esp. 88. 3. Concealment of the circumstance, that this vessel had been engaged in carrying on the trade of belligerants, from one of their colonies, which was considered by the court of admiralty, as an adoption of her by belligerants, and which at all events, increased the risk of seizure and carrying in. 1. C. Rob. Adm. 10; 5 C. Rob. Adm. 327. 4. That the hypothecation of the vessel and cargo, amounted to a transfer to an enemy, so far as to vest an interest in him to the extent of his security, which, by the capture, became vested in his enemy, and consequently, amounted to a breach of the warranty. 2 Caines, 72. 5. That the hypothecation of the policies, transferred them to the obligee, so as to deprive the plaintiffs of the right of recovery on them. 2 Caines, 110. 6. The covering of the property of the belligerant, is a breach of the warranty. 1 Marsh. Ins. 410, 406, 473; [Darby v. The Erstern] 2 Dall. [2 U. S.] 34.

WASHINGTON, Circuit Justice (charging jury). The court, considering the last objection as fatal to the plaintiffs' recovery, the others will be passed over without observation. The meaning of the warranty of neutrality is, that the property insured is neutral in fact, and shall be so in appearance and in conduct. That is to say, that the property belongs to neutrals; that it shall be so documented as to prove its neutrality; and that no act of the insured or his agents shall be done, which can legally compromit its neutrality. If, for the want of papers required by the law of nations or treaties, or if by unneutral conduct, a loss ensues, or even an impediment occurs which varies or increases the risk, although a loss is not the consequence; the warranty is not complied with. This is clearly the doctrine established by the case of Rich v. Parker, 1 Marsh. 409. The want of the passport required by the treaty between the United States and France, did not justify a condemnation, if, in fact, the vessel was American; but it justified a seizure and carrying in for examination; whereas the passport, had it been on board, would, by the treaty, have been so conclusive, that it would have been the duty of the French cruiser, to have suffered the vessel to proceed. The want of this paper, therefore, was considered a breach of the warranty; since it authorized the carrying the neutral out of his course, and an interruption of his voyage, which is an increase of risk, from which the insurers were by the warranty to be relieved. In this case, it is argued, on behalf of the insured, that the circumstance of having belligerant property on board, was no breach of

the warranty of the neutrality of the vessel. This is very true; because the law of nations does not prohibit the carrying of enemy's goods in neutral vessels; so far from it, that upon the condemnation of the goods, the vessel is entitled to freight. But, if the neutral endeavours by false appearances, to cover the property of a belligerant from the lawful seizure of his enemy, such conduct identifies the neutral with the belligerant, whom he thus endeavours to protect; and the increase of risk, by being carried in for adjudication, is produced, not by a legal act, as in the former case, but by a fraud on the neutrality of his own government, and upon the rights of the belligerant. The warranty of neutrality is broken, by unneutral conduct in the insured. We do not mean to countenance the idea, that such conduct would justify the court of the belligerant in condemning the vessel, for the taint on the cargo, or even the whole of the cargo, because of a part, which can be distinguished from the residue, being covered. It is true, that in case of contraband, covered by a false destination, the British courts of admiralty condemn the vessel on account of the fraud, which seems to carry the punishment very far indeed. But it is enough to produce a forfeiture of the indemnity, if the risk is varied or increased by conduct inconsistent with the duties of neutrality. Upon the whole, there being no doubt as to the facts in this case, the law is clearly in favour of the defendants on this point.

The plaintiffs suffered a nonsuit.